UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Timothy Froelich,** | **Civil No. 06-3074 (MJD-JJG)** |
| Plaintiff, | |
| v. | **REPORT** |
| | **AND** |
| **Michael J. Astrue,**[1] | **RECOMMENDATION** |
| Defendant. | |

JEANNE J. GRAHAM, United States Magistrate Judge

Plaintiff Timothy Froelich seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner), who denied his application for disability benefits under the Social Security Act. Mr. Froelich is represented by Jennifer G. Mrozik, Esq. The Commissioner is represented by Lonnie F. Bryan, Assistant United States Attorney. The parties have submitted cross motions for summary judgment (Doc. Nos. 8, 16), which have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c).

**I.   BACKGROUND**

  **A.   Medical History**

    **1.   Asthma and Chest Pain**

According to the medical records in this matter, which only date back to 2002, Mr. Froelich (Froelich) reported chest pain in January 2002. (Tr. at 212.) Over the following months, his primary care

---

[1] When this action commenced, Jo Anne B. Barnhart was the Commissioner of the Social Security Administration. She has since been replaced by Michael J. Astrue and the case caption is amended accordingly.

physician at the time, Dr. Anthony Ferrara, focused on diagnosing the cause. (*See* Tr. at 208-11.) After ruling out heart disease, Ferrara concluded the chest pain was a complication of asthma, caused in part by obesity. (Tr. at 206.)

Aside from a brief note in June 2003, the medical records do not disclose further chest pain or asthma until Froelich visited Dr. Ward Jankus, a neurologist, on September 2, 2003. The SSA scheduled this examination so that Jankus could evaluate Froelich's impairments. Froelich reported that he was having difficulty breathing, especially in cold and other environmental extremes, which exacerbate his asthma. (Tr. at 229).

The issue was revisited by Dr. Aaron Mark, who assessed Froelich in a report on October 16, 2003. The record does not show whether Mark ever examined Froelich personally, though it may be inferred that Mark reviewed Froelich's medical records. Looking at the results of a cardiac stress test from January 2002, in which Froelich exercised for nine minutes, Mark concluded that "[t]he evidence for asthma is dubious." (Tr. at 235, 244.) The record does not include any of the original documentation from the January 2002 stress test.

Froelich reported to urgent care, complaining of chest pain, on November 19, 2003. (*See* Tr. at 245.) Afterwards Froelich followed up by visiting Dr. Nazifa Sajady, a cardiologist, on December 15, 2003. He reviewed an angiography in June 2003 and a cardiac stress test from July 2003. At the latter test, Froelich exercised for six minutes. Based on these tests, Sajady found that the chest pain was not related to vascular heart disease or connected with exertion. (*Id.*) The record also lacks any original documentation of these tests.

Based on further reports of chest pain in February 2004, Froelich visited another cardiologist, Dr. Thomas Raya, on March 13, 2004. Raya noted that Froelich had a history of chest pain that was caused by cold or exertion. Based on another cardiac stress test on March 5, 2004, Raya noted that Froelich exercised for six minutes, but ended the test early due to fatigue. He found that Froelich had atypical angina but no vascular concerns. (Tr. at 300, 305-06.)

Dr. Todd Stolpman, who had been Froelich's primary care physician since June 2003, offered an opinion about his impairments in a form dated April 15, 2004. Stolpman stated that Froelich had permanent physical limitations due to his asthma. Regarding Froelich's ability to work, Stolpman found that Froelich could "perform limited employment," so long as he was not working outside, and that "deskwork" was "okay." (Tr. at 310).

By a letter "to whom it may concern" on May 12, 2005, Stolpman made similar remarks. He said that Froelich, if he worked in environmental extremes or did excessive walking, would suffer from chest pains. In this letter, Stolpman did not explain the cause of the chest pain. (Tr. at 277.)

In a medical assessment form on June 2, 2005, Stolpman supplied more details on the effects of Froelich's asthma. He concluded that, in part due to asthma, Froelich was not able to lift more than five pounds frequently, or more than ten pounds occasionally; that he was unable to work in environmental extremes; and that he has general difficulty with lifting, walking, and exertion. (Tr. at 322, 325.)

### 2. Stroke

After Froelich reported dizziness, some visual blurring, and tingling in his left finger, he was scheduled for an MRI of his head in April 2002. That test revealed that, at an undetermined point beforehand, Froelich suffered a minor stroke. (Tr. at 217.) When another MRI was taken in August 2003,

the results were substantially identical to those from April 2002.  (Tr. at 260.)

Aside from the stroke being noted in his medical history, this concern was not revisited until Froelich visited Jankus on September 2, 2003.  At that examination, Froelich denied that the visual blurring affected his ability to drive.  Jankus did not identify any particular concerns arising out of the prior stroke, and he did not state whether the dizziness, blurring, or tingling was problematic.  (Tr. at 228, 230).

At a visit with Stolpman on September 12, 2003, Froelich reported that he was suffering from blurry vision in his left eye.  (Tr. at 253.)  The record does not reflect that Stolpman took any action to remedy this issue.

Further discussion about the stroke does not return until Stolpman's letter on May 12, 2005.  He mentions that Froelich has vision problems in his left eye due to the stroke.  (Tr. at 277.)  But in the forms he completed on June 2, 2005, Stolpman made a far broader assessment.  He found that the stroke affected Froelich's ability to handle stress and to understand or remember job instructions.  (Tr. at 320.)  He also found the stroke impaired Froelich's ability to lift, as noted previously, and that it caused other environmental and exertional limits.  (Tr. at 322, 324-25.)

### 3. Movement

As noted previously, the record shows that Froelich had some difficulty with exertion, in the context of cardiac stress tests.  But he did not report concerns about his ability to move or walk until he applied for disability benefits on July 1, 2003.  In that application, he stated that he was unable to walk more than 200 feet.  (Tr. at 132, 139.)

When he visited Jankus on September 2, 2003, Froelich further discussed these concerns.  According to Jankus' report of the visit, Froelich said his legs were okay, "but he does notice, if he walks

4

more than a block or two, they seem to get wobbly like they might not hold him up." Froelich otherwise denied any difficulty standing or using his arms. Jankus also noted Froelich was working sixteen hours as a security guard on the weekends, and "if they gave [Froelich] more hours he thinks he probably could do them without difficulty." (Tr. at 228-29.)

These concerns were considered by Mark in his assessment of October 16, 2003. As noted beforehand, the record does not show whether Mark ever met or examined Froelich. Mark found that Froelich could stand or walk up to six hours of an eight hour work day, and that he had no limits on his ability to move in other postures. (Tr. at 236-37.)

These issues did not resurface again for over a year. Froelich met with Dr. David Boxall, an orthopedist, on August 16, 2004. The record does not indicate whether Stolpman referred Froelich for this examination. Boxall noted that Froelich was having difficulty with prolonged standing and walking, and he diagnosed Froelich with degenerative joint disease in his knee. (Tr. at 261.)

At a visit on September 2, 2004, Boxall also diagnosed Froelich with carpal tunnel syndrome in his right hand, recommending surgery to treat the problem. (Tr. at 298.) The surgery occurred on September 27, 2004. (Tr. at 298.) At a follow-up visit on October 7, 2004, Boxall concluded that Froelich was "managing well" and that numbness in his right hand "has almost completely resolved." (Tr. at 269.)

The knee issues were referred to another orthopedist, Dr. Mark Sigmond. In his notes from an examination on January 3, 2005, Sigmond noted that over the past three years, Froelich reported increasing knee pain from prolonged standing and walking. Froelich also mentioned that his left knee sometimes felt like it would buckle, and that it hurt if he walked for more than one block. Sigmond concluded that

Froelich had "mild to moderate" degenerative joint disease in his left knee, and he recommended surgery to alleviate the condition. (*See* Tr. at 265-66.)

The surgery took place on January 13, 2005. (Tr. at 294-95.) Two days later, Froelich was discharged "ambulatory on crutches," and was scheduled to have his leg placed in a new cast. (Tr. at 291-92.) The medical records do not show further indication of follow-up, except for a form that Sigmond completed on February 24, 2005.[2] The form provided space to list any permanent physical limitations Froelich may have, but Sigmond did not list any. Sigmond added that Froelich would be "able to perform limited employment" starting April 4, 2005. (Tr. at 308.)

In his letter of May 12, 2005, Stolpman opined that Froelich was unable to do "excessive" walking; that he had a permit for handicapped parking; and that he recommended a desk job with little walking. (Tr. at 277.)

In his medical assessment of June 2, 2005, Stolpman concluded in part that, due to Froelich's carpal tunnel, he was only able to lift more than five pounds frequently, or more than ten pounds occasionally. Stolpman also found that Froelich was unable to stand or walk for more than one hour of an eight hour work day, and that he could only stand or walk up to fifteen minutes without resting. But Stolpman did not identify the cause for these restrictions. Stolpman separately determined that, due to knee arthritis, Froelich could not sit more than one hour at a time and he had severe limits on his ability to move in other postures. (Tr. at 322-24.)

---

[2] Portions of this form cannot be read. Describing Froelich's temporary limitations, the form states that "[illegible] to walk [illegible] [left] leg." It is unclear whether this brief statement would shed any further light on Froelich's condition. (Tr. at 308.)

### 4. Sleep Apnea

The only other relevant medical condition in this matter is sleep apnea. Stolpman initially diagnosed Froelich with sleep apnea after visits on September 12 and 30, 2003. (Tr. at 251, 253.) A sleep study on October 21, 2003 confirmed this diagnosis, and Froelich was given a breathing device to wear in his sleep. (Tr. at 231.) In a pain questionnaire on December 8, 2003, Froelich said that he was only able to sleep three to four hours per night. (Tr. at 175.)

When Sajady conducted a cardiology examination of Froelich on December 15, 2003, Sajady suggested that sleep apnea might be a cause of irregular heartbeat and a contributing factor to chest pain. (Tr. at 246.) By a letter "to whom it may concern" on February 20, 2004, Stolpman said that Froelich suffers from sleep apnea; that he needs a breathing device to sleep; and that without the device, he may be too fatigued to work. (Tr. at 249.)

Sleep apnea is discussed at only one other place in the record. In his medical assessment of June 2, 2005, Stolpman states that due this condition, Froelich is unable to work nights and his night vision is reduced. (Tr. at 321.)

### B. Procedural History

Froelich applied for disability benefits on July 1, 2003. In a form with the application, he claimed that he had been disabled since December 2001; and that his impairments included asthma, stroke, and difficulty walking. (Tr. at 113, 132.) This application was denied initially on October 11, 2003. (Tr. at 81-82.) Froelich sought reconsideration, and with this request, he added that he also suffered from sleep apnea. (Tr. at 150-51.) The application was denied on reconsideration on November 25, 2003. (Tr. at 83-84.)

Froelich then requested a hearing before an Administrative Law Judge (ALJ), which took place on May 25, 2005. In his testimony at the hearing, Froelich said that his asthma was a major problem, that he used an inhaler daily, but he still had difficulty breathing and suffered chest pains. (Tr. at 38.) Regarding the effects of his stroke, Froelich said that his eyesight was growing worse, that his muscles were twitching and that his face was sometimes numb. (Tr. at 41.)

On his motion impairments, Froelich stated that he could only sit, walk, or stand for five to ten minutes at a time. (Tr. at 41.) He admitted that, following his knee surgery in January 2005, he received physical therapy for a while "and they said I didn't need it any more." Froelich explained that he was in a wheelchair for the first two months after the surgery. He used crutches for another month and was using a cane at the time of the hearing. (Tr. at 49.)

On his work as a security guard, Froelich said that he worked eighteen hours each weekend, an eight hour shift and a ten hour shift. Because of his impairments, Froelich claimed he was often unable to conduct rounds or perform other tasks at this job. (Tr. at 42.) Froelich otherwise stated that he was able to keep his household, and that he visited his friends three to four times per week, for a few hours each visit. (Tr. at 45.)

The ALJ received testimony from Dr. Paul Gannon, a medical expert who had not personally examined Froelich. Gannon found Froelich could lift up to ten pounds frequently and up to twenty pounds occasionally. He added that Froelich could stand or walk up to six hours per eight hour work day, with some movement in other postures, with an option to sit or stand as needed. Gannon also determined that Froelich should not work in environmental extremes, due to asthma, and that he should not be required to perform fine hand movements. (Tr. at 59-60.)

Regarding Froelich's recent orthopedic issues, Gannon noted the recent carpal tunnel surgery but found that Froelich would have fully recovered in four to six weeks. Gannon also determined that it would take Froelich three to six months to recover from his recent knee surgery. (Tr. at 63, 67.)

The ALJ posed a hypothetical, consistent with the limitations set out by Gannon, to Robert Brezinski, a vocational expert. Brezinski said that a person with these limitations could not work as a security guard but could work as a surveillance system monitor. He then opined that there were one thousand jobs as a surveillance system monitor in the state of Minnesota, of which 150 are full time positions. (Tr. at 68-70.)

On cross examination by Froelich, Brezinski said that since 1995, he had testified in "quite a few" cases for the SSA. (Tr. at 74.) He admitted that surveillance system monitor was not listed in the *Dictionary of Occupational Titles*. (Tr. at 75.) Regarding his estimate of the jobs available, Brezinski testified as follows:

> Q. That's a thousand jobs?
>
> A. Correct.
>
> Q. How many full time?
>
> A. It's about 150.
>
> Q. Based on what?
>
> A. Based on my estimate of the numbers that there would be.
>
> Q. It's an estimate, no hard facts or data?
>
> A. Correct.
>
> Q. Okay. You don't have any methodology with coming up with

9

>             your estimate, do you?
>
> A.          I've indicated in the past that there is approximately 16,000 security guards and surveillance system monitors related to that, and I would estimate that there would be about a thousand—
>
> Q.          The answer is there's no methodology, there's an estimate?
>
> A.          That's correct.

(Tr. at 75-76.)

The ALJ issued the decision on October 18, 2005. He determined that Froelich was able to control his asthma with medication, and that it did not significantly limit his ability to work. He also found that the stroke did not cause any significant neurological concerns. (Tr. at 21-22.)

The ALJ specifically held that Froelich was not credible, especially about his ability to move and walk, based on the medical records, as well as his testimony that he was able to maintain his household and frequently visited friends. (Tr. at 22.) Discounting the June 2, 2005 assessment by Stolpman, the ALJ noted that Stolpman did not back his assessment with medical findings; that he was inconsistent with his May 15, 2005 letter; and that he was contradicted by other specialists who had treated Froelich. (Tr. at 23.)

Adopting the testimony by Gannon, the ALJ determined that Froelich's impairments did not substantially limit his ability to work. Relying on the testimony by Brezinski, he added that Froelich had significant work available as a surveillance system monitor. The ALJ accordingly ruled that Froelich was not disabled and did not qualify for disability benefits. (Tr. at 23-24.)

Froelich requested review of this decision by the Appeals Council of the SSA, which denied this request on July 1, 2006. (Tr. at 8.) This appeal follows.

## II.   DISCUSSION

### A.   Standard of Review

When reviewing a decision to deny benefits, a court considers whether the decision of the ALJ is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003). Substantial evidence means such relevant evidence a reasonable mind might accept as adequate to support a conclusion. *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The court must consider evidence that both favors and detracts from the decision. *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998). So long as more than a scintilla of evidence supports the decision, that decision shall be affirmed, even though substantial evidence may also support a contrary outcome. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001).

### B.   Opinion of Treating Physician

Froelich first argues that the ALJ did not accord proper weight to the opinion of Stolpman, his treating physician. This argument correctly proceeds from the principle that, as a general rule, the opinion of a treating or examining physician is entitled to substantial weight. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

Such opinions, however, do not have conclusive weight. The opinion of a treating physician must be supported by acceptable clinical or diagnostic data. *Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004) (quoting *Kelley*, 133 F.3d at 589). The ALJ need not consider the opinion in isolation, but may also view it in the context of the record as a whole. *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007).

Consistent with these principles, if a specialist or a consulting physician offers an opinion about a patient's impairments, and a primary care physician then suggests narrower restrictions, the opinion of the primary care physician has less weight. *Choate v. Barnhart*, 457 F.3d 875, 870 (8th Cir. 2006); *cf. Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (holding that a specialist's opinion, in the specialist's field of expertise, is entitled to more weight than the opinion of a nonspecialist).

The opinion of a treating physician may be less credible where that person contradicts his or her own findings elsewhere in the record. *Gonzales v. Barnhart*, 465 F.3d 890, 896 (8th Cir. 2006). The same may be true where the opinion of a treating physician is contradicted by other evidence of the patient's activities. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

The ALJ found that Stolpman's assessment had little weight. In support of this finding, the ALJ observed that in the assessment of June 2, 2005, Stolpman determined that Froelich's stroke led to several impairments. Yet the record does not substantiate these impairments. The ALJ further noted that Stolpman contradicted himself: the limitations stated in his June 2 assessment are broader than in his letter of May 12, 2005. And the ALJ observed that, though Stolpman placed significant limits on Froelich's ability to move, the treating orthopedists made no comparable assessments.

Froelich argues that the ALJ substituted his own judgment for Stolpman's. But the findings of the ALJ are founded on the medical record. For instance, it is plain that Stolpman had little or no role in the treatment of stroke or motion impairments. Yet Stolpman suggested discrete limits on Froelich's ability to see and move. He did not offer a meaningful explanation for these limits, and there is not clinical or diagnostic data to support them. To the contrary, the consulting orthopedists contemplated a full recovery.

Under these circumstances, the ALJ had reason to discount Stolpman's opinion. The record elsewhere supplies reasonable evidence supporting the ALJ's findings on Froelich's impairments. In this regard, the decision is supported by substantial evidence and may be affirmed.

### C.     Period of Disability

In the context of the medical records, Froelich presents an incidental issue. Rather than an open or indefinite period of disability, Froelich argues, the ALJ should have considered a closed period of disability. He proposes that the ALJ should have considered the period from January 2003 to April 2005, asserting that this period would cover the time Froelich needed to recover from his stroke and the orthopedic surgeries.

Under the standard of review, the inquiry is not whether it was possible that Froelich was disabled during this period. The question is whether the ALJ had substantial evidence to conclude that Froelich was not disabled.

The record shows that Froelich suffered a stroke some time before April 2002, yet only minor impairments resulted. With the exception of some symptoms Froelich reported in September 2003, the record does not indicate that the symptoms of the stroke worsened. Nor did treatment focus on these concerns. Because substantial evidence shows that the stroke had limited effects, there is no particular reason that it would be of greater concern from January 2003 to April 2005.

Froelich was diagnosed with carpal tunnel syndrome in August 2004, and after surgery, this issue was resolved by October 2004. The record does not indicate how long, prior to August 2004, Froelich suffered from this condition. The ALJ could easily conclude, on the basis of substantial evidence, that this impairment had no long term effects.

Based on Froelich's own reports and the ensuing surgery, it is possible to infer that the knee condition worsened from 2003 through 2005. Some documents, such as the cardiac stress tests and the report by Mark on October 16, 2003, suggest that the knee was less problematic in 2003. As the record is generally silent about the knee from November 2003 to August 2004, it does not supply much evidence of this trend.

Although some evidence in the record shows that the knee condition persisted from January 2003, the record is largely silent on the severity of this condition. And there is other evidence in the record that shows the knee was not cause for concern until 2005. The record implicitly provides a reasonable basis for the ALJ to conclude that the knee was not at issue for the entire period from January 2003 to April 2005. So the decision of the ALJ is consistent with substantial evidence from the record.

### D.    Mental Impairments

Froelich briefly argues that the ALJ did not adequately address his mental impairments, in particular those caused by his stroke. The record suggests that the stroke affected his sight and his motor control, but there is no indication that it caused other mental impairments. Because Froelich did not identify any mental impairments in his applications, or in the proceedings before the ALJ, such matters are waived and merit no further discussion here. *See Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003).

### E.    Evaluation of Claimant's Credibility

Froelich contends that the ALJ improperly evaluated his credibility. He argues that the ALJ did not assess his testimony in the context of the entire record, and that the ALJ failed to evaluate his testimony in accordance with the factors set out in *Polaski v. Heckler*. 739 F.2d 1320 (8th Cir. 1984). The Commissioner counters that the ALJ had reason to discount the testimony of Froelich, in light of the entire

record, and that express review of the *Polaski* factors was unnecessary.

An ALJ may not disregard the subjective complaints of a claimant, even if those complaints are not supported by medical evidence. *Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999). Where those complaints are inconsistent with medical evidence and the record as a whole, however, an ALJ has good cause to find that the claimant is not credible. *Baker v. Barnhart*, 457 F.3d 882, 892-93 (8th Cir. 2006); *Goff v. Barnhart*, 421 F.3d 875, 792 (8th Cir. 2005).

In the Eighth Circuit decision of *Polaski v. Heckler*, the court adopted a five-factor test for determining the credibility of subjective complaints of pain by the claimant. 739 F.2d 1320, 1322 (8th Cir. 1984) (adopting 20 C.F.R. § 404.1529(c)(3)). This standard has since been used to evaluate other subjective complaints. *See, e.g., Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004).

An ALJ need not explicitly cite or discuss *Polaski* so long as the decision shows that the ALJ considered all the factors. *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001). Those factors include, but are not limited to, the claimant's daily activities; the duration, intensity, and severity of pain; precipitating and aggravating factors; the dosage and effectiveness of medication; and whether the pain results in functional restrictions. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

Even though the ALJ here did not cite *Polaski*, his decision reflects consideration of these factors. Regarding daily activities, the ALJ found that Froelich manages his household and visits his friends, and that he works over weekends. The ALJ found that Froelich suffers from pain, which may worsen upon exertion or in environmental extremes. But the ALJ also determined the pain was intermittent and that it did not require substantial medication. The ALJ devoted lengthy discussion to the total impact of Froelich's

15

impairments, finding many functional restrictions, such as limits on lifting, walking, and exertion.

Froelich testified that, due to his impairments, he was unable to stand or walk for more than fifteen minutes at a time. This testimony was not supported by the medical records. And it was not credible in light of evidence, including his own testimony, he worked eighteen hours every weekend and visited his friends several days a week. When examined as a whole, the record supplies good cause for the ALJ to determine that Froelich was not credible. So this aspect of the decision is also supported by substantial evidence.

### F.     Qualifications of Expert

Turning to the vocational questions, Froelich claims the ALJ lacked substantial evidence to determine there were significant jobs available in the economy. In support of this position, Froelich argues in part that the vocational expert was not qualified to offer an opinion, based on the expert's own admission that he employed no data or methodology.

It is well established that, in a disability benefits hearing before an ALJ, the Federal Rules of Evidence do not apply. For this reason, the proponent of an expert is not required to establish the sort of qualifications that are otherwise required under Rule 702. *See Richardson v. Perales*, 402 U.S. 389, 400 (1971).

This principle, however, leaves an underlying concern: the degree of foundation needed for the opinion of a vocational expert to supply substantial evidence about job availability. This issue comes up rarely in the context of disability benefits decisions. The most meaningful authorities on this point are two recent decisions from the circuit courts.

In the Ninth Circuit decision of *Bayliss v. Barnhart*, the claimant challenged the basis of a vocational expert's opinion on job availability. 427 F.3d 1211 (9th Cir. 2005). The court found that an ALJ "may take notice of any reliable job information, including information provided by a [vocational expert]." *Id.* at 1218. It then said, without further analysis, "A [vocational expert's] recognized expertise provides the necessary foundation for his or her testimony. Thus, no additional foundation is required." *Id.*

The Seventh Circuit took a different view, also in the context of job availability, in *Donahue v. Barnhart*. 279 F.3d 441 (7th Cir. 2002). That court explained,

> Rule 702 does not apply to disability adjudications . . . . But the idea that experts should use reliable methods does not depend on Rule 702 alone, and it plays a rule in the administrative process because every decision must be supported by substantial evidence. Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth. Even in court, however, an expert is free to give a bottom line, provided that underlying data and reasoning are available on demand[.]
>
> * * *
>
> When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion. . . . If the basis of the vocational expert's conclusions *is* questioned at the hearing, however, then the ALJ should make an inquiry (similar though not necessary identical to Rule 702) to find out whether the purported expert's conclusions are reliable.

This Court finds the approach of the Seventh Circuit sound and applies it here.

At the hearing here, Froelich asked the vocational expert to explain how he determined the availability of work as a surveillance system monitor. But the vocational expert could not supply any data or methodology to support his opinion. It is difficult not to conclude that the opinion was "conjured out of

17

whole cloth," the danger that the Seventh Circuit warned against.

Froelich timely challenged the foundation of the vocational expert's opinion, yet the record lacks any reasonable evidence that would supply such foundation. Thus the decision of the ALJ, on the question of availability of work, was not founded on substantial evidence. This Court concludes that it is appropriate to remand back to the ALJ for further proceedings on this issue. *See* 42 U.S.C. § 405(g).

### G.    *Dictionary of Occupational Titles*

Froelich further asserts that the opinion of the vocational expert is faulty because he referred to a job, surveillance system monitor, not listed in the *Dictionary of Occupational Titles*.

As a threshold matter, it may be noted that the position of surveillance system monitor is in fact listed in the *Dictionary*, even though the ALJ and the vocational expert found the contrary. *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles* ¶ 379.367-010 (4th ed. 1991); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 978 (8th Cir. 2003); *Weiler v. Apfel*, 179 F.3d 1007, 1111 & n. 3 (8th Cir. 1999). Although that listing only contemplates surveillance of "public transportation terminals," it is reasonable to infer that this position may include surveillance of private premises.

An ALJ cannot rely on testimony conflicting with the classifications in the *Dictionary* unless there is evidence to rebut those classifications. Where a vocational expert can define a class of jobs distinguishable from those listed in the *Dictionary*, this opinion may supply substantial evidence. This inquiry should be pragmatic, based on a practical understanding of the nature of employment. *Hillier v. Social Security Administration*, 486 F.3d 359, 366-67 (8th Cir. 2007).

Although the ALJ arguably committed a technical error, the record supplies some reasonable evidence that there are jobs as a surveillance system monitor. It sufficiently rebuts any inconsistency with

18

the *Dictionary*, and it provides substantial evidence in support of ALJ's decision here.

### III.     CONCLUSION

The ALJ had reason, based on the entire medical record, to discount the opinion of Froelich's treating physician; and the ALJ had good cause, based on the entire record, to discount Froelich's own testimony regarding his impairments. On these matters, the decision of the ALJ is appropriately affirmed. As the opinion of the vocational expert lacked foundation, it did not supply reasonable evidence that Froelich could perform a significant number of jobs in the economy. This Court concludes that remand on this issue is appropriate, with the parties' motions for summary judgment handled accordingly.

### IV.     RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.  Froelich's motion for summary judgment (Doc. No. 8) be **GRANTED.**

2.  The Commissioner's motion for summary judgment (Doc. No. 16) be **DENIED.**

3.  This matter be **REMANDED** to the ALJ for additional proceedings, solely on the question of whether there is a significant number of jobs that Froelich could perform in the economy.

Dated this 19th day of July, 2007.                              s/Jeanne J. Graham

                                                                JEANNE J. GRAHAM
                                                                United States Magistrate Judge

### NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by August 7, 2007. A party may respond to the objections within

ten days after service. Any objections or responses filed under this rule shall not exceed 3,500 words. The District Court shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.